# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| VANESSA MILES, | : | Bankruptcy No. 07-14495DWS |
| | : | |
| Debtor. | : | |

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| BRIAN V. BEAL and | : | Bankruptcy No. 08-10357DWS |
| ANN E. BEAL, | : | |
| | : | |
| Debtors. | : | |

# MEMORANDUM OPINION

**BY:  DIANE WEISS SIGMUND, United States Bankruptcy Judge**

Before the Court are the Objections of the Chapter 13 trustee (the "Trustee") to the Chapter 13 plans proffered by debtor Vanessa Miles ("Miles"), Case. No. 07-14495 and joint debtors Brian and Ann Beal (the "Beals"), Case No. 08-10357.  The Objections raise a common ground for urging the Court to deny confirmation of these plans.[1]  Both plans provide that the Debtors shall make all payments under their respective plans to a secured

---

[1]  As a consequence, both contested matters presently under advisement will be addressed in this Memorandum Opinion.

creditor directly rather than to the Trustee for distribution to those creditors.  Given the

differing facts of each case, I will exercise my discretion to approve the plan proposed by the

Beals (the "Beal Plan") but withhold it with respect to the plan proposed by Miles

(the "Miles Plan").


## FACTUAL BACKGROUND

### A.  Vanessa Miles

This is Miles' fifth bankruptcy case since 2002.[2]  Her fourth case was dismissed with

a 180-day bar against filing a further bankruptcy petition without leave of Court as a result

of her three prior unsuccessful cases.[3]  Miles obtained Countrywide's consent to a fifth case

by entering into a "Filing Stipulation" with Countrywide wherein she agreed to remain

current on post-petition mortgage payments to it and Chapter 13  plan payments to the

Trustee as well as committed to file a Chapter 13 plan that adequately provided for

Countrywide's proof of claim.[4]

In this latest case, after filing three plans that provided for a cure of Countrywide's

pre-petition arrears and reinstatement of its mortgage, Debtor changed her approach and

proposed a Third Amended Plan that contemplated paying Countrywide's claim in full over

---

[2]  Much of the procedural and factual background of the Miles case is detailed in my
opinion addressing her objection to the claim of her mortgagee, Countrywide Home Loans, Inc.
("Countrywide").  See In re Miles, --- B.R. ----, 2008 WL 5412308 (Bankr. E.D. Pa. 2008).
The relevant history as relates to this contested matter is set forth herein.

[3]  Miles consented to the bar order upon dismissal to settle a prior Trustee motion to dismiss.

[4]  The Filing Stipulation anticipated that claim to be approximately $48,000 although the
Debtor expressly reserved her right to review and object to it.  Miles, 2008 WL 5412308 at *1.

the remaining life of the plan.[5]  This was not an insignificant change.  Debtor's default under

the mortgage had been reduced to judgment in March of 2003, between her first and second

bankruptcy cases.  By providing for full payment of the judgment rather than a cure and

reinstatement of the mortgage, Debtor was able to utilize Pennsylvania's merger doctrine to

eliminate approximately $5,800 in post-judgment "escrow advances" for taxes and insurance

premiums by prosecuting a successful objection to Countrywide's claim (the "Objection").[6]

Id. at *2-3 (discussing In re Stendardo, 991 F.2d 1089 (3d Cir.1993)).  The Objection was

strenuously defended by Countrywide which had assumed an arrears plan would be pursued

which would ensure that these advances would be repaid, and resulted in an allowed secured

claim in the amount of $85,752.30 plus interest at 6% over the life of the 60-month plan.

Id. at *4.  I ordered Miles to file an amended plan and increase the wage order to fund the

allowed claim.

       Until the Third Amended Plan, when Miles was contemplating reinstatement of the

mortgage, her proposed payments were bifurcated, i.e she proposed payments to the Trustee

toward the arrears, while making current mortgage payments to Countrywide.  The wage

orders in effect up to that point ordered her employer to send payments to both the Trustee

and Countrywide.  After changing to her total cure strategy, Miles' Third and Fourth

Amended Plans as well as subsequently amended wage orders provided for the entire plan

---

        [5]  Debtor's first plan was followed by an unnumbered "Amended Plan" with numeration
applied to subsequent amendments.  Thus, while I now have before me Miles' "Seventh Amended
Plan, in actuality, it is the eighth proposed plan.

        [6]  The Objection also raised a claim for recoupment under the Truth-in-Lending Act,
15 U.S.C. § 1638(a)(2)(A), (a)(3), (a)(4) and (a)(6), which I ultimately rejected.  Id. at *4-5.
Miles has taken an appeal of this portion of my decision.

payments to be paid to the Trustee. Consistent with her Fourth Amended Plan, there is still an order in place providing for Miles' employer to make monthly payments to the Trustee in the amount of $1,875. Doc. No. 109 (the "Third Wage Order").

After further amendment by Debtor to her Plan and Countrywide to its proof of claim, I now have before me Debtor's Seventh Amended Plan.[7] The most significant change, which originated in the Fifth and has carried through to the Seventh Amended Plan, is that Miles now proposes to cease all further plan payments to the Trustee. Instead, the remaining plan payments, now calculated by Debtor as $1,924.23 per month,[8] are to be paid by Debtor directly to Countrywide by way of a proposed amended wage order. The Trustee's sole remaining function will be to disperse $7,500 of the $11,440 paid as of the date of the filing of the Seventh Amended Plan,[9] to Countrywide, with the rest going toward Miles' attorney's fees and the Trustee's commission.

---

[7] The Objection was taken under advisement with respect to confirmation of Debtor's Sixth Amended Plan. While the issue was being briefed by the parties, Debtor filed a Seventh Amended Plan that increases the monthly payments to address Countrywide's objection to the Plan's provision of interest, but is otherwise identical to the Sixth Amended Plan. Given that the issue pressed by Countrywide and the Trustee, i.e., direct Debtor versus Trustee disbursement of plan funds, is the same in the Seventh Amended Plan and as the parties have had an opportunity to supplement their memoranda, I will view the pending objections as being addressed to the Seventh Amended Plan.

The Seventh Amended Plan also contemplates a potential modification of the loan, pursuant to a recent settlement agreement between the Pennsylvania Attorney General and Countrywide. See Press Release dated January 28, 2009, available at: http://www.attorneygeneral.gov/press.aspx?id=4273. It is unclear whether Miles's loan meets the eligibility requirements to participate in this settlement and the payments the Seventh Amended Plan are proposed if loan modification is unavailable.

[8] Debtor is willing to raise her monthly plan payment to $1,924.23 to resolve the ongoing dispute with Countrywide over calculation of interest.

[9] This amount continues to increase, as the monthly payments of $1,875 continue to be made under the extant wage order.

The Trustee objects to Debtor making future plan payments directly to Countrywide. The Chapter 13 trustee program is wholly funded by commissions paid by debtors calculated as a percentage of the funds which the trustees receive from the debtor. 28 U.S.C. § 586(e)(2). Thus, the Trustee receives no commission on payments that debtors pay directly to creditors under a plan. The consequence of this plan amendment is to eliminate the receipt by the Trustee of the commission which otherwise would have been payable on account of these plan payments. While secured creditors generally prefer direct payment as ensuring a speedier receipt of the plan funds, Countrywide joins in this objection to confirmation, stating its wish to be paid by and through the Trustee. Plan confirmation is also opposed by the Trustee on the grounds that the Seventh Amended Plan is underfunded even if Debtor is permitted to avoid the Trustee commission on the Countrywide payments.[10]

Also pending is the Trustee's Motion to Dismiss this case on the basis of plan infeasibility, i.e., the total claims to be paid through the plan exceed the value of the plan

---

[10] There are other secured and unsecured claims filed in this case, including a secured claim by the City of Philadelphia, which the Seventh Amended Plan proposes "will not be treated in this plan, but will be deferred until after this case is over . . ." While the Seventh Amended Plan proposes paying all other timely-filed claims on a pro rata basis, as a practical matter, there is nothing left to pay after Countrywide, Miles' attorney, and the Trustee's commission.

The City has filed an objection that the Seventh Amended Plan violates §1325(a)(5)(B)(II)(ii). There is no such subsection of § 1325. There is a § 1325(a)(5)(B)(i)(II), which states that a plan shall be confirmed if it provides that a secured creditor shall retain its lien if the case is dismissed or converted. However, it would seem that the City's lien is adequately protected by the Seventh Amended Plan language providing that "the City shall retain its lien until it is paid." Section 1325(a)(5)(B)(ii), which mandates confirmation if payments to a secured creditor under a plan are made at "present value," i.e with interest, would not appear implicated by the Seventh Amended Plan, which is not proposing payments to the City. Given that I ultimately conclude the Trustee's objection should be sustained, supra, I need not try decipher the City's objection. If an Eighth Amended Plan is filed, the City should filed an amended objection that clearly states the basis of its objection.

(the "Dismissal Motion").   However, the Dismissal Motion is based upon the Second

Amended Plan, which proposed to pay a secured claim by the City of Philadelphia.

Beginning with the Third Amended Plan, Miles has expressly stated that the City's claim will

not be paid.   Thus, the Dismissal Motion is clearly mooted by subsequent plan amendments.

## B.   Brian and Ann Beal

Like Miles, the Beals have proposed a Chapter 13 plan primarily to address mortgage

debt, in their case several secondary mortgages on their  primary residence.   It appears

that they are current on the primary mortgage, held by PNC Bank, N.A. ("PNC").[11]   The Beal

Plan provides for payments to the Trustee totaling $10,518, from which they will cure

approximately $900 in arrears under their second mortgage with PNC securing a home

equity line of credit.   Beal Plan ¶ 4-5.   The Beals are making current payments under the

second mortgage directly to PNC.  Schedule J.   In addition to arrears on the second mortgage,

the Plan payments to the Trustee are allocated to a priority tax claim of $2,784, attorney's

fees, and a pro rata distribution toward unsecured claims.

While direct payments to PNC on account of the current obligation under the second

mortgage are not objectionable to the Trustee, the Plan's intention for the Debtor to pay PNC

directly on account of another mortgage obligation is.   This payment arises from the

settlement of an adversary proceeding addressing Debtors' third and fourth mortgages.

Stipulating that PNC has a fully secured third mortgage in the amount of $75,000 and a

totally undersecured fourth mortgage debt to be classified as a general unsecured claim of

---

[11]  I glean this from the following facts:  there is no proof of claim filed with respect to a
primary mortgage; there is no provision addressing it in the Plan; and it was not addressed in the
adversary proceeding discussed below.

$80,000, the parties agreed how this secured debt would be paid.  Doc. No. 11, <u>Beal v. PNC</u>

<u>Bank, N.A.</u>, Adv. No. 08-119 (the "Stipulation").  The Stipulation provides for monthly

payments of $632.89 for 180 months (15 years) to be made by the Debtors directly to PNC

on account of the third mortgage.  <u>Id.</u>  The Beal Plan was amended to reflect this settlement,

thereby reducing plan payments to the Trustee to $50 and releasing the balance of the

prior plan payment, <u>i.e.</u>, approximately $600, to the Debtors for direct  payment  to PNC.

Unlike the Miles Plan, these direct payments to PNC for the third mortgage will not result

in a full cure at the end of the plan period.  Rather, the Beals are commencing payments that

will go on for years after their Chapter 13 case is completed.  PNC has no objection to the

Beals' treatment of any of its loans. As stated below, in light of the historic policy in this

district regarding direct debtor disbursements of current obligations, it is not clear to me

why the Trustee finds this direct payment offensive.

As with the Miles case, the Trustee has a pending motion to dismiss based upon

feasibility.  At the confirmation hearing, the Trustee's staff attorney conceded that this

motion is moot in light of the settled adversary action and that the plan is feasible.  The only

objection therefore raised by the Trustee is the Beals' direct payments to PNC of the third

mortgage during the plan period.[12]

---

[12]    At the confirmation hearing, held the same day as the Miles confirmation hearing,
the Trustee's staff attorney requested a continuance.  There was no pending objection to the Beal
Plan, but in light of the Trustee's position in Miles, the staff attorney wanted to reevaluate the
necessity of filing a like one.  I denied the continuance request but allowed her to preserve an oral
objection and supplement it in writing based on the outcome of the reevaluation.  A written objection
followed which, I note also raised other issues the Trustee had not raised at the confirmation hearing.
While the Court has always given considerable leeway to the Trustee with regard to filing written
objections to the many plans he reviews, the attempt to press objections not raised at the concluded
(continued...)

**DISCUSSION**

The role of a Chapter 13 trustee as the dispersing agent of payments made under a

Chapter 13 plan has been universally recognized:

> Chapter 13 is available to individuals who earn a regular income.  Debtors
> propose a plan by which they will repay some or all of their debts through
> regular payments to a chapter 13 trustee.  The trustee pays the sums collected
> to creditors according to the plan for a period of up to five years.  The trustee
> is not involved in the daily lives of the debtors.  He or she does not take
> possession of debtors' nonexempt assets or monitor ordinary course usage of
> assets.  The trustee does not receive any of the debtors' earnings except what
> is paid to him or her as prescribed by the chapter 13 plan.

In re Griner, 240 B.R. 432, 436 (Bankr. S.D. Ala.1999).  See also In re Richardson,283 B.R.

783, 800 (Bankr. D. Kan. 2002) (The role of the standing Chapter 13 trustee is . . . to receive

the projected disposable income and to disburse it to prepetition allowed claims according

to the terms of the plan); In re Bowker, 245 B.R. 192, 195 (Bankr D. N.J. 2000) (Basic role

of a Chapter 13 trustee is to review plans, advise the court with respect to plans, and act as

a disbursing agent under confirmed plans).  The disbursing function is implicated by several

related provisions of the Bankruptcy Code:

> "[T]he plan shall . . . provide for the submission of all or such portion of future
> earnings or other future income of the debtor to the supervision and control
> of the trustee *as is necessary for the execution of the plan*[.]"  11 U.S.C.
> § 1322(a)(1) (emphasis added).

> "Unless the court orders otherwise, the debtor shall commence making
> payments not later than 30 days after the date of the filing of the plan or the

---

(...continued)

confirmation hearing will not be allowed.  While the Court has a *sua sponte* duty to ensure that all
requirements of confirmations are met, none of the issues newly raised by the Trustee have sufficient
support for me to deny confirmation on these grounds.  Rather I will only consider the objection the
Trustee's staff attorney preserved at the hearing, i.e., whether direct payments to the mortgagee are
permissible.

order for relief, whichever is earlier, in the amount . . .  proposed by the plan <u>to the trustee</u>[.]."  11 U.S.C. § 1326(a)(1) (emphasis added).

If a plan is confirmed, <u>the trustee shall distribute</u> [plan payments] in accordance with the plan as soon as practicable."  11 U.S.C. § 1326(a)(2) (emphasis added).

"<u>Except as otherwise provided in the plan or in the order confirming the plan</u>, the trustee shall make payments to creditors under the plan."  11 U.S.C. § 1326(c) (emphasis added).

Section 1326(c) has been interpreted to reflect the presumption that disbursement to creditors be made by the Trustee.  <u>In re Sanford</u>, 390 B.R. 873, 878-79 (Bankr. E.D. Tex 2008); <u>In re Vigil</u>, 344 B.R. 624, 628-29 (Bankr. D. N.M. 2006); <u>In re Burkhart</u>, 90 B.R. 724, 725 (Bankr. N.D. Fla. 1988).  Nonetheless, there is some flexibility for the bankruptcy court to order otherwise.  Indeed, the parties agree that a bankruptcy court has considerable discretion to allow direct payments by the debtor to creditors under the plan.  <u>See</u> <u>e.g.</u> <u>Matter of Aberegg</u>, 961 F.2d 1307, 1308 (7th Cir. 1992); <u>Matter of Foster</u>, 670 F.2d 478, 486 (5th Cir. 1982).  However, the debtor must present a valid reason for the deviation.  <u>In re Barber</u>, 191 B.R. 879, 885 (D. Kan. 1996); <u>Sanford</u>, 390 B.R. at 879; <u>Vigil</u>, 344 B.R. at 629.

In practice, the extent to which trustees and debtors handle disbursements under a plan varies by district.  <u>In re Lopez</u>, 372 B.R. 40, (9th Cir. BAP 2007) (discussing different practices).  In this district, a practice has developed of allowing a "bifurcation" of disbursing agent roles where a chapter 13 debtor seeks to cure a prepetition default in accordance with § 1322(b)(5), typically seen in plans dealing with arrears in house and car payments.  In such instances, he or she will customarily pay the cure payments to the Trustee over the life of the plan, while making his or her current postpetition payments, <u>i.e.</u>, the payments required by

-9-

the "maintenance of payments" obligation under § 1322(b)(5) directly to the creditor.[13]
While this practice deprives the Trustee of commission income on these current payments,
prior to these contested matters the Trustee had not interposed an objection in any of the
cases before me on such grounds.

Several courts have articulated a logical basis for allowing debtors to make current
payments directly to secured creditors of long-term debt such as mortgages while paying
arrears through the trustee. These payments will continue long after the Chapter 13 plan has
expired. It is counterintuitive to have debtors make their regular mortgage payments to the
Chapter 13 trustee for the term of the plan and then change their practice again after the
case is completed. In re Burkhart, 90 B.R. at 726; In re Hines, 7 B.R. 415, 421 (Bankr. S.D.
1980). On the other hand, there are sound reasons to pay arrears through the trustee:

> The debtor's ability to cure the default on a home mortgage is frequently the
> heart of a Chapter 13 plan. The arrearage payments are temporary and
> catch-up in nature, and they typically are accounted for separately by the
> secured creditor. The trustee can disburse the arrearage payment without
> interfering with the established debtor-creditor relationship, and, furthermore,
> in so doing the trustee is thereby able to continue to monitor the debtor's
> compliance with the plan.

Burkhart, 90 B.R. at 726; accord Matter of Aberegg, 961 F.2d 1307, 1309 (7th Cir.1992)
(citing Burkhart); In re Westpfahl, 168 B.R. 337, 362 (Bankr. C.D. Ill. 1994) (same).[14]

---

[13] In contrast, debtors in the Western District of Pennsylvania make all plan payments to the
Trustee, including current maintenance payments that will continue after discharge to the secured
creditor. There is a similar practice in the Southern District of Texas, which mandates by local rule
that current mortgage payments be paid to the Trustee during the course of a chapter 13 case. Perez
339 B.R. at 392.

[14] To be sure, there is room for disagreement. Some courts view payment through the trustee
of both arrears and current mortgage payments as ensuring a successful chapter 13 case by debtors
(continued...)

This bifurcation of arrears and current payments between the trustee and debtor also balances the rights of the secured creditor, who is entitled to timely maintenance payments after a debtor enters into bankruptcy, 11 U.S.C. § 1322(b)(5).  A secured creditor who will have an ongoing contractual relationship with the debtor long after the bankruptcy benefits from the continuity of payments resulting from having the same disbursing agent both during the bankruptcy and after.  Indeed, "[b]ecause Chapter 13 trustees typically disburse money to creditors once a month, it is unlikely that the regular monthly disbursement . . . will satisfy every Chapter 13 debtor's contractual obligation to make mortgage payments by a certain date each month," perhaps even resulting in late fees and charges.  1 Keith M. Lundin, Chapter 13 Bankruptcy § 59.1, 59-16 to 59-17 (3d ed. 2000 & Supp. 2004).[15]  At least one court has found such a practice further bolstered by recent amendments under the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA").  In In re Clay, 339 B.R. 784 (Bankr. D. Utah 2006), the court analyzed § 1325(a)(1)(C), which requires a debtor, within thirty days of filing a case, to commence adequate protection payments "directly to a creditor holding an allowed claim secured by personal property to the extent the claim is attributable to the purchase of such property . . ."  The court noted:  "It would seem an awkward result

_____

(...continued)
who have already demonstrated a questionable ability to manage a budget on their own.  See Perez, 339 B.R. at 390-91; In re Teagardener, 98 B.R. 318, 321 (Bankr. S.D. Ohio 1989).  However, the Trustee, who has never advocated such a policy for this district, did not argue that direct payments to the Trustee would enhance the success of the Beal Plan.

[15]  Lundin opines that late payments as a result of trustee disbursements on a differing schedule could could be viewed as an impermissible modification of the creditor's rights, prohibited by § 1322(b)(2).  Id. at 59-15 to 59-16.  See also In re Harris, 107 B.R. 204, 207 (Bankr. D. Nev. 1989) (so holding).

if the debtor could make payments directly to secured creditors before plan confirmation but never make such payments after confirmation." Id. at 788.

Thus, the issue before me is not whether a debtor can make direct payments to his or her creditors as this is already a Trustee-sanctioned practice in this district under the foregoing scenario, but rather "setting proper boundaries to the power." In re Lopez, 372 B.R. 40, 46 (9th Cir. BAP 2007).  While I am hard pressed to understand the basis for the Trustee's opposition to the Beals' Plan where current payments of a modified long-term mortgage are proposed to be paid directly by the Beals, the Miles Plan appears to test the limits of that power by proposing that the sole claim, a secured judgment, be paid directly by the Debtor, leaving no remaining role for the Trustee in the implementation and administration of the Chapter 13 case.

My evaluation of the two plans being challenged by the Trustee is informed by the many decisions which have identified various factors to determine whether to allow debtors to make direct payments.  Relevant considerations are (1) the ability of the trustee and the court to monitor future direct payments; (2) the potential burden on the trustee; (3) the possible effect upon the trustee's salary or funding the U.S. Trustee system; (4) the potential for abuse of the bankruptcy system; (5) the number of payments proposed to pay the targeted claim; (6) the plan treatment of each creditor to which a direct payment is proposed to be made; (7) the consent, or lack thereof, by the affected creditor to the proposed plan treatment; (8) the ability of the debtor to reorganize absent direct payments; and (9) the good faith of the debtor in proposing direct payments.  Perez, 339 B.R. at 409 (citing twenty-one factors culled from various cases); In re Pianowski, 92 B.R. 225, 233-34 (Bankr. W.D. Mich.1988)

(enumerating thirteen factors)); In re Bettger, 105 B.R. 607, 609 (Bankr. D. Or.1989)

(reducing the Pianowski factors to eight).

The Trustee's objection is driven in part by the third factor, i.e., a concern that the

direct payment approach will jeopardize the vitality of the Chapter 13 program, which is

funded solely from commissions based on amounts received by debtors.  The Trustee argues

that his office would suffer if all plans proposed direct payments to secured creditors and the

Trustee lost the income represented by commissions on those payments.   Chapter 13

Standing Trustee's Brief ("Trustee Brief." at 2) (citing 1 Keith M. Lundin, Chapter 13

Bankruptcy § 59.1, at 59-2 to 59-3 (3d ed. 2000 & Supp. 2004)).  Indeed there appears to be

a consensus that it is improper to allow debtors to make direct payments solely to avoid

paying the trustee's commission.  In re Sauer 2004 WL 1043150, *2 n.7 (Bankr. E.D. Pa.

2004).[16]  See also; In re Reid, 179 B.R. 504, 508-09 (E.D. Tex.1995); Perez, 339 B.R. at 409;

In re Generous, 137 B.R. at 411, 413 (Bankr. W.D. Wash. 1992).  See also In re Vigil, 344

B.R. at 628 (noting that the trustee system was envisioned by Congress as a self-funding

program, citing 28 U.S.C. § 586(e)).

The Trustee suggests that allowing direct payment in these cases is heading down

the proverbial "slippery slope."  Presumably taken to its inevitable conclusion, debtors will

seek to avoid commissions to gain confirmation of underfunded plans which in turn will

jeopardize the financial stability of the program.  The concern is a valid one.  What the

Trustee does not address is how to reconcile the direct payments he routinely allows debtors

---

[16]  In Sauer I denied confirmation on the basis that the plan terms at issue were internally
inconsistent. Id. at *2. Thus, I did not have to address whether or to what degree direct payment
by a debtor is a allowable.

-13-

to make, i.e., current post-petition mortgage payments, with the direct payments proposed

by Miles and Beal.  If the Objection represents a change in the Trustee's policy, he needs to

be more explicit.  Since he has not stated as much, I must assume that in the Trustee's

opinion, there is something about these challenged Plans that has crossed the permissible

boundaries of direct debtor disbursement.  I will consider whether that is so with respect to

each Plan next.

                    The Miles Plan

        As noted, the Miles Plan does not propose to cure mortgage arrears while

maintaining current mortgage payments that will extend beyond the plan period, the type

of plan where the Trustee has historically conceded direct monthly payments made to the

mortgagee.  Instead, Miles has determined to pay the foreclosure judgment and is using the

extended time that a chapter 13 bankruptcy allows to pay that obligation in full.  11 U.S.C.

1322(b)(3).  See also In re Iberia, 235 B.R. 204, 209 (Bankr. D. Puerto Rico1999) (noting

that § 1322(b)(3) allows a debtor to cure any default over the life of a plan).  The payments

that Miles proposes making directly to Countrywide are payments not available to her under

the terms of her mortgage and they must be completed by the end of her Plan.  Indeed these

proposed debtor disbursements of a final judgment are more akin to the arrearage portion

in a cure plan that is typically paid to and administered by the Trustee.

        The Trustee also raises concerns under factors one and two, i.e., the ability of the

Trustee and burdens placed on his office by direct debtor payment.  Trustee's Brief at 4.

Given that it is the Trustee's duty to supervise execution of the plan and insure payments

-14-

are made under the plan, the Court should accord appropriate deference to the Trustee's judgment that he can more easily monitor a debtor's compliance by requiring payments be made through him. <u>In re Case</u>, 11 B.R. 843, 846 (Bankr. D. Utah 1981). Miles counters that her payments are being made by her employer pursuant to a wage order, and that the Trustee can verify payments by inquiry of the employer. However, it seems onerous to place a duty upon the Trustee to make such inquiries, especially when he receives no compensation for this new task.

While arguably Countrywide is in the best position to monitor plan compliance as the recipient of the payments, it strongly opposes payment other than through the Trustee. The creditor's position is a relevant factor to consider. <u>Perez</u>, 339 B.R. at 409. "[A] creditor should have the right to insure protection of its interests under the plan by refusing to deal further directly with the debtor with whom it may have experienced problems in the past." <u>Case</u>, 11 B.R. 843 at 846. However, Countrywide correctly notes that Mrs. Beal's employer is not a party to this proceeding and has no fiduciary obligations. If her employer fails to remit payment, Countrywide and/or the Trustee would have no recourse save costly litigation. A similar concern was raised by the <u>Perez</u> court:

> Weyerhaeuser [debtor's employer], unlike the trustee, is not bonded and is not in the business of acting as a disbursing agent and keeping records of such payments. Hence, if Weyerhaeuser ever failed to remit a payment to the mortgagee, neither the mortgagee nor the trustee would have any recourse against Weyerhaeuser; or, if they did, such recourse would be in the form of a lawsuit, which requires time and money. Permitting Mr. Friar' employer to make the Debtors' home mortgage payments would severely compromise the ability of the trustee and the Court to monitor the payments.

339 B.R. at 411.[17]

Given the history between Countrywide and Miles, I can appreciate that Countrywide would welcome the Trustee's support in the event of a plan default. Seemingly a motion to dismiss for missed plan payments made by the Trustee and joined in by Countrywide would cost Countrywide less and perhaps have a better chance of success. It also may be that Countrywide's objection is driven by a recognition that the extra commission expense may put confirmation beyond Miles' reach. Countrywide cannot welcome a further deferral of repayment after the delay it has been subjected to in five bankruptcy cases. Countrywide's position may also be colored by Miles' failure to live up to her bargain to pay its arrears proof of claim and maintain current payments that was, at least in its view, the *quid pro quo*, of its consent to a fifth case.

I must also consider Miles' good faith in proposing a disbursement scheme opposed by both the Trustee and Countrywide. Perez, 339 B.R. at 409. While Miles' switch to a full-payment plan was not prohibited, it was certainly not contemplated by the parties when they reached their Stipulation to allow her to refile. Countrywide never envisioned having to bear the post-judgment expenses that would have been reimbursable under the terms of a reinstated mortgage. Clearly Miles would have had to pay those sums to Countrywide under an arrears plan but has taken advantage of the uniquely bankruptcy benefit of paying the full balance over five years to reduce this amount. Having received the advantages of bankruptcy law, it is rather brazen of her to urge an accommodation to

---

[17] A Chapter 13 trustee must file a bond with the court and therefore provides debtors with a remedy in the event that the trustee breaches his duties. 11 U.S.C. § 322.

allow a direct payment of the full mortgage balance claiming that she cannot afford the Trustee commission.

Miles argues that the most significant consideration is "the ability of the debtor to reorganize absent direct payments," which is also a factor that courts have considered. Miles Memorandum of Law at 5; <u>Perez</u> 339 B.R. at 409.  She calculates that paying Countrywide's claim through the Trustee, and the resulting commission, would require monthly payments of $2,074, which is $150 more than the $1,924 payment Miles proposes to pay in her Seventh Amended Plan.  Debtor asserts that this higher payment is impossible for her.

As an initial matter, Miles' position is fraught with the potential for abuse, another important consideration to be weighed by the Court.  <u>Id.</u>  Presumably debtors could easily take a liberal view of their expenses that would reduce available income to fund the plan just short of the amount necessary to pay required claims <u>and</u> the Trustee's commissions. Accepting Miles' justification for circumventing the Trustee commission would be a disincentive for debtors to maximize funds available for the Chapter 13 plan through conservative budgeting.  Thus, it seems to me that any such claim by a debtor must be carefully scrutinized.

Miles did not make an evidentiary record, leaving the Court with only her schedules to confirm her claim that payment of the trustee commission is the sole impediment to a confirmable plan.  However, and somewhat ironically, Schedules I and J indicate that she cannot even afford the payments she is currently making.  Miles receives $2,091 in net pay

-17-

from her employer, which combined with her husband's monthly income of $1,728, totals $3,819. Schedule I. Subtracting the $2,330 in monthly expenses for a family of five, Miles has $1,589 available in net income to fund her plan.[18] Schedule J. Despite this she is currently making plan payments under a wage order in the amount of $1,875 ($276 in excess of available income) and proposes to increase this amount to $1,924 ($335 in excess of available income). Seventh Amended Plan. Miles did not testify or provide any other evidence as to her ability to make the increased payments. Thus, I simply cannot find credible Miles' plea that the Trustee's commission will make or break her case, when it is clear that her schedules have no basis in reality. It is the debtor's burden to establish that her plan meets all the confirmation requirements, including plan feasibility. 11 U.S.C. § 1325(a)(6). Since I cannot determine how she is making her current plan payments and supporting herself and family with this monthly deficit, how can I determine whether an additional $150 per month would doom her reorganization? Rather I agree with the Trustee that Miles has not established that her Seventh Amended Plan is feasible without regard to the Trustee commission that would be required if Countrywide was paid through the Trustee and not directly as Miles proposes.

Seemingly, the foregoing conclusion regarding feasibility precludes confirmation of the Seventh Amendment Plan. However, in fairness to all parties given the possibility that

---

[18] Schedule J actually has expenses totaling $2,912, but this includes $682 toward her mortgage payment. Since Miles is not reinstating her mortgage, this monthly payment must be subtracted from Schedule J.

Debtor would file yet an Eighth Amended Plan or seek reconsideration of this decision based on some "changed circumstance" fashioned as newly discovered evidence, my alternate holding is that the Seventh Amended Plan is not confirmable due to its provision to cease future payments to the Trustee and pay the judgment claim directly to Countrywide.

As the Trustee has not sought dismissal based upon Miles' alleged inability to fund her plan, I will merely deny confirmation at this juncture. Presumably the Trustee will file a new dismissal motion. If Debtor has the resources to fund a further amended plan that pays Countrywide and the Trustee's commission, she will be put to her proof at that time or suffer dismissal of this case.

The Beal Plan

Unlike Miles who has availed herself of a uniquely bankruptcy payment provision, the Beals have simply entered into a modified and restated mortgage contract. Through settlement of the adversary proceeding, the Beals have effectively negotiated a new 15-year loan secured by the third mortgage, whose payments commence during the plan period. The $632.89 payments they wish to pay directly to PNC represent current payments owed under this new contract memorialized in the Stipulation. These payments will continue for a decade beyond the plan term. They are no different than the current mortgage payments typically made directly by debtors to mortgagees or from the payments the Beals are making on their first mortgage. As noted above, the Trustee historically has permitted debtors to make current mortgage payments directly to their mortgage holders. He has not explained why the Beal Plan should be treated differently.

Moreover, unlike the Miles Plan, direct payment to PNC will not leave the Trustee without any duties in this Chapter 13 case.  Under the Beal Plan, the Trustee will receive plan payments from the Debtors necessary to make distributions to PNC on account of the arrears on the second mortgage as well as pay priority claims and make a pro rata distribution to allowed unsecured claims.  Finally and in contrast to Countrywide, PNC, who will continue to have an ongoing creditor-debtor relationship with the Beals beyond this bankruptcy case, has not objected to direct payment.  Under these circumstances, I see no reason for the PNC payments pursuant to the Stipulation to be made to the Trustee.  The Trustee's Objection to paragraph 3 of the Miles Plan that provides otherwise is overruled and confirmation is granted.

Orders consistent with the foregoing Memorandum Opinion shall be entered in each case.

_____
DIANE WEISS SIGMUND
United States Bankruptcy Judge

Dated:  April 7, 2009

-20-